IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KRISTEN FRANKOVICH,           )
                              )
                              )        2:19-CV-01643-CCW
            Plaintiff,        )
                              )
      v.                      )
                              )
PITTSBURGH PUBLIC SCHOOLS,     )
                              )
                              )
            Defendant.        )
                              )

## OPINION

Plaintiff Kristen Frankovich claims that her employer, Defendant Pittsburgh Public Schools ("PPS"), discriminated against her on the basis of her race (Caucasian) in violation of Title VII of the Civil Rights Act by: (1) treating African American employees more favorably than her on particular occasions from 2012–2017; (2) failing to reclassify (promote) her in 2018; and (3) subjecting her to retaliation in 2019 when she complained about this allegedly disparate treatment. *See generally* ECF No. 13. In its Motion for Summary Judgment, PPS argues that: (1) Ms. Frankovich's 2012–2017 claims are time-barred; (2) Ms. Frankovich cannot point to evidence sufficient to make out a prima facie failure to promote claim; and (3) she likewise cannot establish a prima facie case of retaliation. *See* ECF No. 43 at 1–2. For the reasons set forth below, the Court will grant PPS' Motion.

## I.      Background

### A.      Procedural History

Ms. Frankovich initiated this case by filing a Complaint on December 18, 2019. *See* ECF No. 1. She filed her operative Amended Complaint on March 23, 2020. ECF No. 13. In the Amended Complaint, Ms. Frankovich asserts claims for unlawful employment discrimination on

the basis of race under Title VII, 42 U.S.C. § 2000e, *et seq.* (Count I);  unlawful retaliation, also under Title VII (Count II);  and unlawful employment discrimination under the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, *et seq.* (Count III).  *See id.* at ¶¶ 34–39, 40–44, and 45–51.

Following discovery, PPS filed its Motion for Summary Judgment, which is now fully briefed and ripe for disposition.  *See* ECF Nos. 40–43, 48–50.

### B.     Administrative Exhaustion

Ms. Frankovich cross-filed a charge with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Rights Commission ("PHRC") on March 25, 2019 ("First Charge").  *See* ECF No. 50. at ¶ 1.  In the First Charge, Ms. Frankovich claims to have been discriminated against on the basis of race by PPS since 2007, specifically claiming that PPS' "actions, from in or about 2012 until the present, indicate a continuing course of discriminatory conduct towards Caucasian employees and evidence a continuing violation" of Title VII.  *See id.* at ¶¶ 2, 4.  The First Charge does not state the earliest date of discrimination, but it does place the latest date of discrimination at November 15, 2018.  *See id.* at ¶ 3.

Ms. Frankovich then cross-filed a second charge with the EEOC and PHRC ("Second Charge") on August 2, 2019.  *See id.* at ¶ 5.  Ms. Frankovich signed the Second Charge on May 2, 2019, and identified the latest date of discrimination as May 9, 2019.  *See id.* at ¶ 6.[1]  In general, Ms. Frankovich's Second Charge claims that PPS employees (including "decisionmakers") retaliated against Ms. Frankovich after she filed the First Charge.  Ms. Frankovich's Second Charge describes the retaliatory conduct as consisting of African American employees "display[ing] a marked difference in their interactions with [her]," not treating her "with

---

[1] Ms. Frankovich appears to dispute that she signed the charge on May 2, *see* ECF No. 50 at ¶ 6; however, she testified that she signed the second charge on May 2, 2019.  *See* ECF No. 42-1 at 192:5–10).

professionalism or respect," being wrongfully accused of not performing her job, and being subjected to "increased scrutiny" by PPS decisionmakers and employees. *Id.* at ¶ 7.

The EEOC issued Dismissal and Notice of Rights letters to Ms. Frankovich for the First and Second Charge on November 27, 2019 and March 11, 2020, respectively. *See id.* at ¶¶ 9–11.

### C.    Material Facts

The following facts, related to Plaintiff's claims for (1) discrimination in the 2012–2017 period, (2) failure to promote/reclassify in 2018, and (3) retaliation in 2019, are drawn from the parties' Combined Concise Statement of Material Facts, ECF No. 50, and are undisputed unless noted otherwise.

Ms. Frankovich, who is Caucasian, has been employed with PPS since November 2007. *See* ECF No. 50 at ¶¶ 4, 7, 17.  She began her career as a "supervisory aide 2 (food service worker)," before being promoted to Transportation Assistant in April 2008, a position she remained in until 2014. *See id.* at ¶¶ 17–18.  Ms. Frankovich was then promoted to the position of Project Assistant, Summer Dreamers Academy in May 2014, and finally to her current position as a Chief Executive Secretary in February 2017. *See id.* at ¶¶ 19–20.

### 1.    Alleged Discriminatory Treatment – 2012–2017

Ms. Frankovich's claims for employment discrimination under Title VII (Count I) and the PHRA (Count III) rest, in part, on alleged discrimination that occurred in the 2012–2017 period.

First, in 2013, PPS hired an African American woman to fill the position of Transportation Account Clerk on an acting basis. *See* ECF No. 50 at ¶¶ 26–27.  Ms. Frankovich would have applied for the position had it been advertised. *See id.* at ¶ 28.  The newly hired acting Account Clerk remained in the position for only a few months. *See id.* at ¶ 29.

Also in 2013, Ms. Frankovich unsuccessfully applied for the position of Program Assistant in Student Support Services. *See id.* at ¶ 41–43.  Ms. Frankovich believes she was not given proper

3

consideration for this position because the hiring officer indicated they had already decided to give the job to Ms. Evelyn Newsome, an African American woman. *See id.*

Next, after Ms. Frankovich had been promoted to Project Assistant, Summer Dreamers Academy in 2014, PPS hired an African American man, who was a former substitute teacher, to fill the position of Transportation Agent. *See id.* at ¶¶ 31–33. This individual was paid a higher salary than what Ms. Frankovich had been making as a Transportation Assistant. *See id.* at ¶¶ 30.[2]

Finally, in 2015, while Ms. Frankovich was employed as the Project Assistant, Summer Dreamers Academy, PPS hired an African American woman on a temporary basis with an hourly stipend equal to the pay of a manager, i.e. higher than Ms. Frankovich's salary at the time. *See id.* at ¶¶ 36–40.

Ms. Frankovich testified that she believed at the time the above summarized decisions were made by PPS that PPS' actions were discriminatory, but she acknowledged that she did not put her complaints in writing, raise them with human resources, or file a claim with any outside agency until she filed her First Charge in March 2019 with the EEOC and PHRC. *See id.* at ¶ 45. Ms. Frankovich attempts to generate a dispute about her testimony on this point, suggesting that she "did not understand the District's conduct to be discriminatory in nature until its denial of Mr. Anderson's repeated requests to reclassify her position in June and November of 2018." *See id.* (Plaintiff's response, quoting Frankovich deposition testimony, ECF No. 42-1 at 105:8-106:12). However, Ms. Frankovich specifically testified that:

> Q.    And if I also understood though given the nature of the conversations that you had like with Mr. Vasser [Director of Pupil Services] and others that you had, you said it was offensive, but you had a sense or a belief that some of these decisions at least were discriminatory; is that fair to say?

---

[2] The Court notes that the parties dispute whether the "Transportation Agent" position was "newly created" or simply Ms. Frankovich's former Transportation Assistant position renamed. *See* ECF No. 50 at ¶ 32. However, whether the Transportation Agent position was newly created is not material to the Court's decision on PPS's Motion.

A.      Correct. There also was just an underlying understanding by pretty much most staff that this was happening. So I mean, at the time it was just understood. So when we had these conversations, we knew that there were certain people that would have to do the work and certain ones would have to, and it was just an understanding. So I didn't -- I don't know. Maybe I should have went to HR earlier, I don't know. I mean, I really liked the work I was doing and I believed in it. I didn't think this stuff would keep continuing.

Q.      So it seems then that after you assumed your current position and then in particular in 2018 when you had discussions with Mr. Anderson about change in job title or maybe more importantly change in pay, that when that didn't happen, you reached the point where you are going to complain and that you also viewed that not in isolation, meaning this was one of several discriminatory decisions that have been made against me; is that fair to say?

A.      Correct.

ECF No. 42-1 at 105:8–106:12.  In light of the above—and given Ms. Frankovich's statement in opposition to PPS' Motion that she "was aware of inexplicable pay inequalities between herself and various African American employees," ECF No. 48 at 5—there is no genuine dispute that Ms. Frankovich testified that she believed the above-summarized decisions made by PPS in the 2012–2017 period to have been discriminatory in nature at the time the decisions were made.

### 2.      Ms. Frankovich Seeks Reclassification – 2018

Ms. Frankovich was promoted to her current position of Chief Executive Secretary in February 2017.  *See* ECF No. 50 at ¶ 20.  In that role, she reported to Mr. Anthony Anderson, Deputy Superintendent, and was responsible for providing "support" to Mr. Anderson and the Chief Academic Officer.[3]  *See id.* at ¶ 52.  Specifically, Ms. Frankovich was responsible for

---

[3] Although not directly relevant here, the Court notes that Mr. Anderson's contract with PPS was not renewed in the summer of 2019.  *See* ECF No. 50 at ¶ 184.  Mr. Anderson testified that he is currently employed by Everett Public Schools in Everett, Washington.  *See* ECF No. 42-5 at 7:3–17.  Ms. Frankovich now reports to Ms. Minka Jenkins,

"[c]alendars, payroll attendance for [Mr. Anderson's] department, which included the chief of school side and documentation.  She set up for the professional learning activities, and travel and liaison for communication with schools if they contacted and communication with parents."  *See id.* at ¶ 53.[4]

Sometime in or around June 2018, and again in November 2018,[5] Ms. Frankovich "initiated a discussion with [Mr. Anderson] about her job responsibilities and classification" because she believed "that individuals were 'being given titles that provided them with more pay' despite doing the 'same type of work' and 'said she was doing more work.'"  *See id.* at ¶¶ 56–58, 99–100.  Ms. Frankovich's position was never reclassified, however.  Mr. Anderson testified that he did not know (or could not recall) "where that stop came from," although he did recall learning that reclassification of Ms. Frankovich's position would not be presented to the Board around the same time that he had a conversation with Ms. Erikka Fearbry Jones, Chief of Staff to the Superintendent, about the idea of reclassifying Ms. Frankovich's position.  *See id.* at ¶ 95;  *see also* ECF No 42-5 at 29:20–31:10.[6]

---

Chief Academic Officer, and Dr. Lynette Hoofkin, Assistant Superintendent for Transportation.  *See* ECF No. 50 at ¶ 242.

[4] Ms. Frankovich disputes PPS' statement of facts in ¶¶ 52–53 on the grounds that "[t]he cited material does not read as stated."  While technically correct that the cited material—ECF No. 42-5 at 14:9–12 and 14:17–22—does not read as stated, it is clear that this is the result of a simple typographical error.  The passages PPS quotes from Mr. Anderson's deposition testimony appear at the cited line numbers on page 15 of the transcript, not page 14.  Thus, there is no genuine dispute here.

[5] PPS disputes whether this second conversation between Mr. Anderson and Ms. Frankovich took place, in large part because Mr. Anderson could not specifically recall it.  *See* ECF No. 50 at ¶ 270.  However, because the occurrence (or non-occurrence) of this second conversation is not material to the Court's decision on PPS' Motion, we need not resolve that disagreement here.

[6] Ms. Frankovich attempts to dispute that Mr. Anderson does not recall "where that stop came from," arguing that "Ms. Fearbry Jones informed him that his request for reclassification of the Plaintiff's position had been denied, as Ms. Fearbry Jones, along with [Ms. Dinkins-Malone] are the last District employees to handle any paperwork prior to its presentation before the Board of Directors."  *Id.* at ¶ 83.  However, the fact that Ms. Fearbry Jones and/or Ms. Dinkins-Malone "handle" paperwork before it goes to the Board, *see* ECF No. 42-5 at 30:19–24, does not raise a genuine dispute, especially in light of Mr. Anderson's unequivocal testimony:

> Q.    And if I understood your testimony, you're not certain who it was that said this would not go forward to the board or indicated that?
>
> A.    I can't remember. Yeah. So no, I can't remember who or where that stop came.

6

According to Mr. Anderson, in requesting reclassification, Ms. Frankovich specifically identified Ms. Renee Dinkins-Malone and Ms. Ida Simpson as individuals whose "titles were changed from the similar title with hers to program manager I think it is, who were significantly – paid significantly higher." *Id.* at ¶ 59. Indeed, Mr. Anderson recalled that the "conversation just was they were all African American females. They were actually at a lower position because there [sic] were assistants from my direct reports. Student services assistant was two levels down and they were all doing the same work." *Id.* at ¶ 61. Mr. Anderson testified that Ms. Frankovich "came to [him] more around the lines of it's not fair," and he responded by indicating that he "would put in a request to change her position to Project Manager." *Id.* at ¶¶ 62–63.

Mr. Anderson recalled speaking with senior PPS officials about reclassifying Ms. Frankovich's position, although the timeline and content of these conversations is somewhat in dispute. *See, e.g., id.* at ¶¶ 83, 92–94. For, example, Mr. Anderson recalled speaking with Ms. Fearbry Jones about reclassifying Ms. Frankovich's position, specifically that Ms. Fearbry Jones "had knowledge that [Mr. Anderson] wanted to move [Ms. Frankovich] to a program assistant and was questioning why," and that Ms. Fearbry Jones' "questioning 'was more around what [Ms. Frankovich's] duties were and responsibilities were.'" *See id* at ¶¶ 92–93. Ms. Fearbry Jones, on the other hand, did not remember specific details about the conversation, but recalled that it was part of a larger discussion about reorganizing Mr. Anderson's department. *See id.* at ¶¶ 86, 88.

Mr. Anderson also recalled speaking with two other officials, Mr. Milton Walters, Chief of Human Resources, and Dr. Anthony Hamlet, Superintendent. Mr. Anderson recalled telling them that "it wasn't fair" because of "the optics of it is you got three black females and you got a

---

*Id.* at 30:6–10.

white female, three black females that have the title." *See id.* at ¶¶ 138, 142–43. Mr. Anderson reported both Mr. Walters and Dr. Hamlet as being supportive of his proposal to reclassify Ms. Frankovich's position. *See id.* at ¶¶ 138 (Walters), 142–143 (Hamlet).

Notwithstanding Mr. Anderson's informal discussion with PPS officials, according to Ms. Fearbry Jones, PPS has an established process for reclassifying a position. *See id.* at ¶ 73.[7] That process involves generating a written job description for the reclassified position; working with the human resources and finance departments to ensure that consistency is maintained across PPS and that the position has the necessary funding; and, ultimately, getting approval from the Superintendent and the School Board. *See id.* at ¶¶ 73–77.[8]

With respect to formally seeking reclassification of Ms. Frankovich's position, Mr. Anderson testified that he "submitted the paperwork to HR" regarding the reclassification request, but could not recall anything specific about that paperwork. *Id.* at ¶ 67. Indeed, Mr. Anderson testified that he "told [Ms. Frankovich] to put it together and I signed it" and that he "would have told [Ms. Frankovich] to do everything she needed to do and I would sign it. And all of that stuff was done by her." *Id.* For her part, Ms. Frankovich "does not recall any written request or document, generated by her to Anderson or submitted by Anderson to the Superintendent's office,

---

[7] Ms. Frankovich attempts to generate a dispute as to Ms. Fearbry Jones' description of PPS' reclassification process by stating that Ms. Frankovich "is without knowledge or information sufficient to form an opinion as to the truth or falsity of the allegations set forth in this paragraph." This assertion of lack of knowledge is insufficient under Federal Rule of Civil Procedure 56(c) to demonstrate a genuine dispute. *See also Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts.").

[8] Ms. Frankovich's alleged comparators, Ms. Renee Dinkins-Malone and Ms. Ida Simpson, both had their positions reclassified to project manager. *See* ECF No. 50 at ¶¶ 108–110 (Simpson), 134 (Dinkins-Malone). According to Ms. Simpson, she did not actively play a role in her reclassification; rather, her supervisor at the time initiated the reclassification process. *See id.* at ¶¶ 108–110. Ms. Dinkins-Malone, on the other hand, testified that she was involved to the extent that she sought a reclassification and provided a list of her day-to-day duties to her supervisor, Dr. Walters. *See id.* at ¶ 130–131. As with Ms. Simpson, Ms. Dinkins-Malone's reclassification was ultimately approved by the School Board. *See id.* at ¶ 134. These facts, standing on their own, do not raise a genuine dispute as to PPS' reclassification process or whether PPS consistently followed that process.

relating to her 2018 request for a promotion/title change." *Id.* at ¶ 68.  Indeed, no written request or documents related to a request for reclassification of Ms. Frankovich's position are part of the record before the Court.

### 3. Alleged Retaliation – 2019

Ms. Frankovich testified that she informed her supervisors, including Mr. Anderson, of her intent to file a lawsuit in January 2019.  *See id.* at ¶ 274.  Then, in March 2019, she filed her First Charge with the EEOC.  *See id.* at ¶¶ 274–75.  Ms. Frankovich testified that, shortly after filing her First Charge, several of PPS' African American employees "displayed a marked difference in their professional interactions with [her]." *Id.* at 275.  Ms. Frankovich specifically identified Ms. Fearbry Jones, Ms. Simpson, Ms. Dinkins-Malone, Ms. Jocelyn Artinger, Ms. Kymberly Cruz, Ms. Jamilla Rice, and Dr. Shemeca Crenshaw.  *See id.* [9]

For example, in opposing PPS' Motion, Ms. Frankovich notes that Ms. Simpson and Ms. Dinkins-Malone "stopped responding to [her] emails and refused to speak to her," *see id.* at ¶ 276, and that Ms. Fearbry Jones criticized Ms. Frankovich's work on several occasions, including one instance in which Ms. Fearrby Jones shouted "you won" at Ms. Frankovich during a phone call about a scheduling conflict.  *Id.* at ¶¶ 170–71, 277.  That said, Ms. Frankovich also testified that during the relevant period she did not regularly work directly with Ms. Simpson or Ms. Dinkins-Malone and could only recall a handful of interactions with Ms. Fearbry Jones.  *See* ECF No. 42-1 at 147:3–148:17 (Simpson and Dinkins-Malone), 150:7–13 (Fearbry Jones);  *see also* Fed. R.

---

[9] PPS contends that Ms. Frankovich lacks "competent evidence that any of the identified employees knew of Frankovich's EEOC charge at the time of any interaction." *Id.* at ¶ 275.  However, PPS does not appear to meaningfully contest Ms. Frankovich's characterization of her interactions with these named employees.  *Id.* (citing testimony from Ms. Fearbry Jones that she did not personally observe PPS employees treating Ms. Frankovich any differently after her lawsuit was reported in the news media).

Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record").

With respect to Dr. Crenshaw—who, "by all accounts, is a difficult individual to work with," ECF No. 50 at ¶ 280—Ms. Frankovich testified that she became more hostile and unprofessional in her interactions with Ms. Frankovich after January 2019.  *See id.* at ¶ 279. Indeed, Mr. Anderson testified, in part because Dr. Crenshaw filed an internal complaint against him, that he believed Dr. Crenshaw's conduct was linked to ongoing friction between himself and Dr. Crenshaw, specifically related to communications Ms. Frankovich sent based on directives she received from Mr. Anderson.  *See id.* at ¶¶ 199–200.  Ms. Frankovich filed a formal HR complaint about Dr. Crenshaw's behavior, which prompted PPS to hire an independent third-party to investigate Ms. Frankovich's claims.  *See id.* at ¶¶ 208–09.  That investigation concluded that, while Dr. Crenshaw's conduct was unprofessional, there was no evidence to suggest a link between Dr. Crenshaw's behavior and Ms. Frankovich's EEOC filings.  *See id.* at ¶¶ 212–13.

Finally, Ms. Frankovich described her interactions with Ms. Rice, Ms. Artinger, and Ms. Cruz as following a similar trajectory to her experience with the other individuals she named, noting that, for example, "Ms. Artinger and Ms. Cruz refused to share their calendars with [her] or report her time directly to [her]" and that Ms. Rice "became 'unprofessional,' 'demanding,' and 'confrontational.'"  *Id.* at ¶¶ 281–283.  That said, Ms. Frankovich stated that she believes Ms. Cruz, Ms. Rice, and Ms. Artinger were "acting at the behest of [Dr.] Crenshaw because of the 'things that they were coming to me directly about and the problems that they were stating.   And also with the commentary of other content leads that were staying that there were problems in that room that were being caused by this person, that person and et cetera.'"  *Id.* at ¶ 216.  She further testified

that, with respect to these individuals, "'it began a lot more into the spring of '19" and it was 'just really silly and dumb things. It was just constant.'" *Id.* at ¶ 217.

## II.   Standard of Review

To prevail on a motion for summary judgment, the moving party must establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A factual dispute is 'genuine' if the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Razak v. Uber Techs., Inc.,* 951 F.3d 137, 144 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986)). "A factual dispute is 'material' if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *NAACP v. N. Hudson Reg'l Fire & Rescue,* 666 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The burden to establish that there is no genuine dispute as to any material fact "remains with 'the moving party regardless of which party would have the burden of persuasion at trial.'" *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996) (quoting *Chipollini v. Spencer Gifts, Inc*., 814 F.2d 893, 896 (3d Cir. 1987)). Furthermore, "[i]f the non-moving party bears the burden of persuasion at trial, 'the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry that burden.'" *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (quoting *Wetzel v. Tucker*, 139 F.3d 380, 383 n.2 (3d Cir. 1998)).

Once the moving party has carried its initial burden, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material

facts…Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 586–87. Thus, while "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *Anderson*, 477 U.S. at 255, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings" and point to "'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (citation omitted). But, while the court must "view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor . . . to prevail on a motion for summary judgment, the non-moving party must present more than a mere scintilla of evidence; there must be evidence on which the jury could reasonably find for the [non-movant]." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013) (internal citations omitted).

### III.    Discussion

PPS puts forward several arguments for why Ms. Frankovich's claims fail as a matter of law, three of which are decisive here. First, PPS points out that any claims related to the allegedly discriminatory treatment Ms. Frankovich experienced during the 2012–2017 period are time-barred because they occurred more than 300 days before Ms. Frankovich filed her first EEOC charge and cannot be saved under the continuing violation theory. *See* ECF No. 43 at 2–7. Next, PPS contends that because Ms. Frankovich cannot point to evidence raising a triable issue of fact as to whether she either (1) actually applied to have her position reclassified or (2) expended every reasonable effort to have her position reclassified, Ms. Frankovich cannot make out a prima facie case of discrimination. *See id.* at 7–11. Finally, PPS argues that the treatment Ms. Frankovich experienced after filing her first EEOC charge either (1) does not rise to the necessary level of

severity or (2) lacks evidence supporting a causal link to her First Charge, and thus her retaliation claim fails as well. *See id.* at 14–17. The Court will address each argument in turn.

A.    **Ms. Frankovich's Claims for Alleged Discrimination from 2012–2017 Are Untimely**

Under Title VII, a plaintiff must file a charge with the EEOC within 180 days of the alleged unlawful employment practice; if the plaintiff also files with a state enforcement agency in a deferral state, like Pennsylvania, the limitations period is extended to 300 days. *See Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013) (citing 42 U.S.C. § 2000e-5(e)(1)). And, while filing a charge with the Pennsylvania Human Rights Commission ("PHRC") extends the applicable limitation period under Title VII, the reverse is not true under the PHRA; indeed, whether or not a plaintiff files with the EEOC, his or her claim must be presented to the PHRC within 180 days of the alleged unlawful employment practice. *See id.* at 164–65 (affirming grant of summary judgment where, despite timely filing EEOC charge, plaintiff failed to file with PHRC within 180-day limitations period under PHRA); *see also* 43 Pa. Cons. Stat. § 959(h).

Here, it is undisputed that Ms. Frankovich cross-filed her first charge with the EEOC and PHRC on March 25, 2019. Thus, unless an exception applies, Ms. Frankovich's First Charge encompasses only alleged discrimination that occurred on or after May 29, 2018 for her Title VII claims and on or after September 26, 2018 for her PHRA claims.

Ms. Frankovich contends that her 2012–2017 claims should survive under the "continuing violation" theory, *see* ECF No. 48 at 3, which permits otherwise untimely claims for "discriminatory acts that are not individually actionable" to be bundled with timely claims "'so long as they are linked in a pattern of actions which continues into the applicable limitations period.'" *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157 (3d Cir. 2013) (quoting *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006)). But, importantly, "individually actionable"

13

instances of alleged discrimination cannot be aggregated under the umbrella of a continuing violation to save otherwise untimely claims. *See Chieke v. Pa. Dep't of Corr.*, 811 Fed.Appx. 770, 771 (3d Cir. 2020) ("At issue, however, are discrete acts—failure to reclassify, failure to promote, and constructive termination—each of which is individually actionable and therefore may not be aggregated to make a 'continuing violation.'") (citing *O'Connor* 440 F.3d at 127) );  *see also Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113 (2002) ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.").

Here, Ms. Frankovich claims that she was "consistently passed over for raises, promotions and various other advancement opportunities in favor of less experienced African American employees from in or about 2012 until approximately 2017." *See* ECF No. 48 at 4–5 (citing ECF No. 50 at ¶¶ 220–39).  Each of the allegedly discriminatory acts Ms. Frankovich complains about in this period, however, constitute separate and distinct employment decisions by PPS.  For example, Ms. Frankovich claims that (1) "[i]n or about 2012, the position of acting transportation account clerk was assigned to an African American temporary employee," who, although allegedly less-qualified than Ms. Frankovich, was paid more, and (2) in 2014, an African American employee was hired, at an increased starting salary, to fill the vacancy created when Ms. Frankovich moved to a new role within PPS.  *See* ECF No. 50 at ¶¶ 220, 223–24.  These actions (and the other instances of alleged discrimination Ms. Frankovich describes in the 2012–2017 period) are each a separate and distinct employment decision of the type the Supreme Court has said cannot be aggregated under the continuing violation theory.  *See Morgan,* 536 U.S. at 113 ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.").

14

Accordingly, because the 2012–2017 incidents occurred more than 300 days before Ms. Frankovich filed her first charge with the EEOC, summary judgment in PPS' favor will be granted on Ms. Frankovich's Title VII and PHRA claims for that period. *See Liszewski v. Moyer Packing Co.,* 252 Fed.Appx. 449, 451 (3d Cir. 2007) (finding that because claimed discriminatory employment decision occurred more than 300 days before plaintiff filed EEOC charge, "[i]t necessarily follows that his PHRA claim is barred as well.") (citing 43 Pa. Cons. Stat. § 959(h)).

**B.     Ms. Frankovich Cannot Make Out a Prima Facie Case for Her Remaining Claims**

The parties agree that Ms. Frankovich's remaining failure to promote and retaliation claims should be analyzed under the familiar *McDonell Douglas* burden-shifting framework. *See* ECF No. 43 at 7; ECF No. 48 at 5–6. The analysis under *McDonnell Douglas* proceeds in three steps. First, the plaintiff must first point to evidence sufficient to satisfy the elements of a prima facie case of employment discrimination or retaliation, thereby creating an inference that his or her employer acted unlawfully. *See Burton*, 707 F.3d at 426. Next, the defendant must rebut this inference by articulating a legitimate, non-discriminatory reason for its action(s). *See id.* The burden of production then shifts back to the plaintiff, who, in order to survive summary judgment, must provide evidence from which a jury could reasonably infer that the defendant's proffered explanation for its conduct is, in reality, pretext for unlawful discrimination. *See id.* at 426–27; *see also Fuentes v. Perskie*, 32 F.3d 759, 763–64 (setting forth burden shifting framework under *McDonnell Douglas* at summary judgment). Finally, because the Third Circuit has found that "[c]laims under the PHRA are interpreted coextensively with Title VII claims," we will address Ms. Frankovich's parallel federal and state law claims in tandem. *Atkins v. Lafayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006) (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)).

### 1.        Failure to Promote/Reclassify

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Generally speaking, to make out a prima facie case of employment discrimination under Title VII, a plaintiff must show that she (1) is a member of a protected class;  (2) is qualified for the position at issue;  (3) has suffered an adverse employment action;  and (4) under circumstances giving rise to an inference of unlawful discrimination.[10]  *See Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410–11 (3d Cir. 1999).  "The existence of a prima facie case of employment discrimination is a question of law that must be decided by the court." *Wishkin v. Potter,* 467 F.3d 180, 185 (3d Cir. 2007) (citing *Sarullo v. United States Postal Serv*., 352 F.3d 789, 797-98 (3d Cir. 2003)).  And, "[t]o establish a prima facie case at summary judgment, 'the evidence must be sufficient to convince a reasonable factfinder to find all of the elements of [the] prima facie case.'" *Burton*, 707 F.3d 426 (quoting *Duffy v. Paper Magic Grp.*, 265 F.3d 163, 167 (3d Cir. 2001)).  That said, of course, "the elements of a prima facie case depend on the facts of the particular case." *Jones*, 198 F.3d at 411 (citing *Pivirotto v. Innovative Sys. Inc.*, 191 F.3d 344, 352 (3d Cir. 1999)).

Here, the parties appear to agree that Ms. Frankovich's remaining discrimination claim— related to PPS' alleged decision in 2018 to refuse her request for a raise and change in job title commensurate with the additional work and responsibilities she had taken on—should be analyzed as a "failure to promote" claim, but the parties also refer to it as a "failure to reclassify" claim.

---

[10] Discrimination claims under Title VII brought by Caucasian plaintiffs, such as Ms. Frankovich, are referred to as "reverse discrimination" claims.  *See Durst v. City of Phila.*, Civil Action No. 17-2933, 2018 U.S. Dist. LEXIS 161608, at *10 n. 11 (E.D. Pa. Sept. 21, 2018) (citing *Stites v. Alan Ritchey, Inc.*, 458 F. App'x. 110, 112 (3d Cir. 2012)).  The Third Circuit has found reverse discrimination claims to be cognizable.  *See id.* (citing *Iadimarco v. Runyon*, 190 F.3d 151, 158 (3d Cir. 1999)).

Although the distinction between the two is subtle, it is not entirely academic;  as a district court in this Circuit recently noted, "the criteria for evaluating the two claims differ in important ways." *Chieke v. Commw. Dep't. of Corr.*, 2019 U.S. Dist. LEXIS 187983, at \*7 (M.D. Pa. 2019) (citations omitted).  Specifically, failure to promote claims often turn on "evidence about how the company advertised the position and who ultimately filled it," which is evidence that usually will not exist in a failure to reclassify case "because no position is advertised and there are no other applicants for it."  *Id.*

Here, the Court need not wade any deeper into the differences between failure to promote and failure to reclassify claims, because PPS' Motion targets the third and fourth elements of the prima facie case,[11] which are common to both;  specifically, PPS argues that Ms. Frankovich cannot point to evidence that she was subjected to an adverse employment action under circumstances giving rise to an inference of discrimination.  *See* ECF No. 43 at 7

Whether seeking promotion or reclassification, to establish the "adverse employment action" element, a plaintiff must point to evidence that she either (1) applied for the job;  (2) made every reasonable effort to convey her interest in the job to her employer;  (3) was deterred from applying by the employer's discriminatory practices and would have applied but for those practices;  or (4) had a genuine and real interest in the job but reasonably believed that formally applying would be futile.  *See Murray v. Beverage Dist. Ctr.*, 533 Fed.Appx. 98, 102 (3d Cir. 2013) (citing *EEOC v. Metal Serv. Co.*, 892 F.2d 341, 348 (3d Cir. 1990) and *Newark Branch, NAACP v. Town of Harrison*, 907 F.2d 1408, 1415 (3d Cir. 1990)).  In other words, if the plaintiff cannot point to evidence that she at least made every reasonable effort to apply, was prevented from doing

---

[11] PPS does not raise any argument with respect to whether (1) Ms. Frankovich is a member of a protected class or (2) that she was/is qualified for the position at issue.  *See* ECF No. 43 at 7.  Accordingly, the Court finds that she has satisfied the first two elements of her prima facie case.

so by discriminatory practices, or held a reasonable belief that applying would be futile, the evidence supporting the plaintiff's prima facie case cannot establish that the employer took any action, adverse or otherwise.  And, absent such adverse action, no reasonable inference of discrimination (the fourth and final element of the prima facie case) can be made.

Viewing the undisputed facts in the light most favorable to Ms. Frankovich, it appears that sometime in June 2018 and again in November 2018 Ms. Frankovich expressed an interest to her supervisor, Mr. Anderson, in receiving a raise and having her position reclassified.  *See* ECF No. 50 at ¶¶ 57–59, 99.  Mr. Anderson then raised the idea to other senior PPS officials, including Dr. Milton Walters, Chief of Human Resources ("HR"), and Dr. Anthony Hamlet, Superintendent of PPS, both of whom, according to Mr. Anderson, either appeared supportive of the idea or did not attempt to dissuade Mr. Anderson from pursuing reclassification of Ms. Frankovich's position.  *See* ECF No. 42-5 at 24:22–23 and 32:2–21.  Indeed, Mr. Anderson reported that Ms. Fearbry Jones questioned him as to Ms. Frankovich's duties and responsibilities—factors that, according to the reclassification process described by Ms. Fearbry Jones are part of PPS' consideration when determining whether to reclassify an employee.  *See* ECF No. *id.* at 25:12–17;  *see also* ECF No. 50 at ¶ 73.

Outside of these informal, verbal communications, however, it does not appear that Mr. Anderson or Ms. Frankovich did anything else to advance any reclassification request, as PPS' process, described by Ms. Fearbry Jones, would have required.  Indeed, while Mr. Anderson testified that he "submitted the paperwork to HR," he could not recall what any of that "paperwork" would have been, instead recalling only that "I would say I told Krista [Ms. Frankovich] to do everything that she needed to do and I would sign it.  And all of that stuff was done by her, so…" ECF No. 42-5 at 21:10, 22:13–15.  And, for her part, Ms. Frankovich testified that she could not

"recall any written request or document, generated by her to Anderson or submitted by Anderson to the Superintendent's office, relating to her 2018 request for a promotion/title change." ECF No. 50 at ¶ 68 (citing ECF No. 42-1 at 44:19–45:2). Neither party has pointed to any document(s) related to a request to reclassify Ms. Frankovich's position.

The conjunction of these facts—(1) Mr. Anderson's testimony that he delegated preparation of any paperwork to Ms. Frankovich; (2) Ms. Frankovich's testimony that she could not recall any paperwork having been prepared or submitted by her or Mr. Anderson; and (3) the absence of any written request for reclassification in the record—is fatal to Ms. Frankovich's claim. Plaintiff does not meaningfully dispute that PPS' reclassification process required her and Mr. Anderson to do more than verbally propose the idea of reclassification. *See* ECF No. 50 at ¶ 73 (testimony from Ms. Fearbry Jones describing the reclassification process). Indeed, as PPS points out, Mr. Anderson testified that he had been involved in a significant effort with HR to "align" various comparable positions within PPS, and thus, it is reasonable to infer that he knew or should have known that the reclassification process would require him to do more than make verbal requests. *See id.* at ¶¶ 97–98; ECF No. 43 at 10. Because Ms. Frankovich has not pointed to evidence that she made every reasonable effort to apply for reclassification, and does not argue that she was either dissuaded from applying or believed that applying would be futile, she cannot make out the third element of her prima facie claim for employment discrimination. *See Lula v. Network Appliance, Inc.*, 245 Fed.Appx. 149, 153 (3d Cir. 2007) ("Even if we were to resolve these facts in her favor and assume, *arguendo*, that [plaintiff] did ask Sheperd and the vice presidents to consider her for the position, we find that her efforts do not rise to the every reasonable effort standard set forth in *Metal Serv. Co*.").

19

Furthermore, even if the Court were to conclude that Ms. Frankovich had satisfied the third element (adverse action) of her prima facie case, we would still conclude that she has not supplied evidence sufficient to support the fourth and final element, i.e. that the circumstances give rise to an inference of discrimination.  With respect to this element, Ms. Frankovich argues (1) that Ms. Dinkins-Malone and Ms. Simpson, who are both African American, are valid comparators, and PPS' reclassification of their positions to that of project manager permits an inference of racial discrimination and/or (2) that the evidence establishes a causal nexus between Ms. Frankovich's race and her position not being reclassified.  *See* ECF No. 48 at 8–9.

First, although comparators need not be similarly situated to the plaintiff in all respects, they must be "similarly situated in all relevant respects."  *Parker v. Farley*, 625 Fed.Appx. 77, 82 (3d Cir. 2015) (citation omitted).  Evaluating comparators is a fact-intensive inquiry;  relevant factors include, but are not limited to whether "'two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Id.* (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617–18 (7th Cir. 2000)).  Here, whether or not Ms. Frankovich and Mr. Anderson believed that Ms. Frankovich's duties overlapped in some respects with those of her alleged comparators, *see* ECF No. 50 at ¶¶ 58–62, Ms. Dinkins-Malone and Ms. Simpson performed different jobs, with different responsibilities than Ms. Frankovich, and reported to different supervisors (with the exception of a short period in 2019 in which Ms. Simpson also reported to Mr. Anderson).  *Compare id.* at ¶¶ 105–107, 115–116 (Simpson); 125–132 (Dinkins-Malone); 243–246 (Frankovich).  In short, while Ms. Frankovich testified that, in addition to her day-to-day duties, she took on projects on an ad hoc basis as assigned by Mr. Anderson, Ms. Dinkins-Malone's and Ms. Simpson's jobs involved ongoing,

district-wide administrative responsibilities.  *See id.*  For example, Ms. Frankovich described undertaking discrete projects like "organiz[ing] an 8th Grade Scholar Ceremony" or "creat[ing] a cohesive handbook containing all relevant policies and procedures for the Office of the Deputy Superintendent."  ECF No. 50 at ¶ 246.  On the other hand, Ms. Dinkins-Malone, in addition to "assisting the chief of human resources; preparing his calendar; review and prepare letters, schedules; schedule meetings; payroll for the entire human resources department," is also responsible for, among other things, "Act 168 forms for incoming and outgoing employees."[12]  *Id.* at ¶ 127.  Similarly, Ms. Simpson, among other duties, is responsible for "coordination of high school commencements [and] senior signing day" for the entire school district.  *Id.* at ¶ 116. Finally, as PPS points out, there is no evidence that, in reclassifying Ms. Dinkins-Malone's and Ms. Simpson's positions, PPS failed to adhere to the process described by Ms. Fearbry Jones or that reclassification resulted from nothing more than verbal requests.  *See* ECF No. 43 at 12 (quoting *Sosinavage v. Thomson*, Civil Action No. 14–3292, 2018 U.S. Dist. LEXIS 87285, *18– *19 (D. N.J. May 23, 2018)).

  Ms. Frankovich's second argument—that there is a causal nexus between her race and her position not being reclassified—rests on the syllogism that because (1) the Chief Executive Secretaries in Ms. Fearbry Jones' department are Caucasian and (2) Ms. Fearbry Jones reportedly told Mr. Anderson that reclassification of Ms. Frankovich's position was denied because it would also require reclassification of the Chief Executive Secretaries in Ms. Fearbry Jones' department, therefore "a reasonable fact finder could conclude that Plaintiff's reclassification was denied on the basis of her race."  ECF No. 48 at 9 (citing *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d

---

[12] Act 168 is a Pennsylvania law mandating certain pre-employment verification related to past sexual misconduct to be provided by a potential employees and their former employers.  *See* 24 P.S. §1-111.1;  *see also Razzano v. Sarandrea,* 431 F.Supp.3d 650, 653 (W.D. Pa. 2019) (discussing Act 168 process).

Cir. 2003)).  Notwithstanding the fact that Ms. Fearbry Jones' alleged statements, without more, do not permit an inference that racial animus was more likely than not the real reason (especially given her alleged focus on the *title* of the positions in question), Ms. Frankovich's argument suffers from a more fundamental problem:  lack of competent evidence.  In short, Ms. Frankovich's causal nexus argument is based on double hearsay—specifically her own testimony and written discovery responses as to what Mr. Anderson told her Ms. Fearbry Jones said.  While hearsay statements, if capable of admission at trial, may be used to support or defend a motion for summary judgment, *see Shelton v. Univ. of Med. & Dentistry,* 223 F.3d 220, 223 n.2 (3d Cir. 2000), Ms. Frankovich has not offered any argument that her testimony about what Mr. Anderson told her Ms. Fearbry Jones said is capable of admission under any exception to the rule against hearsay.  *See King v. City of New Kensington,* 2008 U.S. Dist. LEXIS 76485, at *34 (declining to consider hearsay statements at summary judgment because "[h]earsay statements not capable of being admitted at trial, however, cannot be considered on a motion for summary judgment.") (citing *Philbin v. Trans Union Corp.*, 101 F.3d 957, 961 (3d Cir. 1996)).  Without her own testimony about what Mr. Anderson said Ms. Fearbry Jones said, Ms. Frankovich's "causal nexus" argument is missing a critical evidentiary link and no reasonable inference of discrimination can be made.

Summary judgment, therefore, will be entered in PPS' favor on Ms. Frankovich's failure to reclassify claims in Counts I and III.

### 2.    Retaliation

Ms. Frankovich claims in Count II that certain PPS employees retaliated against Ms. Frankovich after she filed her First Charge with the EEOC.  *See* ECF No. 13 at ¶¶ 24–30;  ECF No. 50 at ¶¶ 274–75.  According to Ms. Frankovich, after she filed her First Charge, "several of the District's African-American employees displayed a marked difference in their professional

interactions with the Plaintiff;" including co-workers not responding to e-mails, rudeness, increased scrutiny, and a lack of professionalism in day-to-day interactions.  *See* ECF No. 50 at ¶¶ 276–77, 279, 281–84.

Under Title VII, it is unlawful for an employer to retaliate against an employee because she "has opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e-3(a).  As such, to establish a prima facie case of retaliation under Title VII a plaintiff must point to evidence that she "'(1) she engaged in activity protected by Title VII;  (2) the employer took an adverse employment action against her;  and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.'" *Moore v. City of Phila.*, 461 F.3d 331, 340–41 (3d Cir. 2006) (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).  Furthermore, "[a]n employer may be liable under Title VII for retaliatory harassment perpetrated by an employee's co-workers only if the prima facie case is satisfied and if there is a basis for employer liability for the coworker's conduct."  *Id.* at 349.

Importantly, although the adverse employment action(s) alleged in a retaliation claim need not rise to the level required for a disparate treatment claim—that is, Title VII's "antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment"—a plaintiff must at least point to evidence of retaliatory conduct "that a reasonable employee would have found [to be]…materially adverse" such that he or she would have been dissuaded from making or supporting a charge of discrimination. *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  Thus, while the level of adversity that will support a retaliation claim is lower than that required for a discrimination claim, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor

annoyances that often take place at work and that all employees experience," and, as such, "normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id.* (citation omitted).

Here, Ms. Frankovich engaged in protected activity when she informed her supervisors of her intent to file a complaint in January 2019 and when she filed her First Charge with the EEOC in March 2019. *See* ECF No, 50 at ¶ 274. However, Ms. Frankovich's retaliation claim fails because she cannot point to evidence in support of elements two and three of her prima facie case. That is, she cannot point to "materially adverse" conduct that would dissuade a reasonable employee for making or supporting a charge of discrimination, and she cannot adequately support the existence of a causal connection between alleged retaliatory actions and her protected conduct.

According to Ms. Frankovich, after informing her direct supervisors (including Mr. Anderson) in January 2019 of her intention to file a charge with the EEOC, and then actually filing said charge in March 2019, "several of the District's African American employees displayed a marked difference in their professional interactions with the Plaintiff." *Id.* at ¶¶ 274–75. Specifically, Ms. Frankovich argues that "[m]any of these employees became unfriendly and nonresponsive to the Plaintiff, or they were actively combative towards her," and that "[s]everal of these employees wrongfully accused the Plaintiff of not performing her job properly and publicly." ECF No. 48 at 9–10 (citing ECF No. 50 at ¶¶ 276–284). But, viewing the record as a whole, the retaliatory conduct Ms. Frankovich claims to have suffered never amounted to more than intermittent criticism of her work or a decline in the collegiality of her interactions with coworkers.

For example, Ms. Frankovich asserts that "Ms. [Renee] Dinkins-Malone became unfriendly, and Ms. [Ida] Simpson stopped responding to the Plaintiff's emails and refused to speak

to her." *See* ECF No. 50 at ¶ 276.  Similarly, Ms. Frankovich cites an occasion when Ms. Fearbry Jones angrily shouted "you won, you won" at Ms. Frankovich during a telephone call about a scheduling conflict.  *See id.* at ¶ 277.  But, Ms. Frankovich also testified that during the relevant period she did not regularly work directly with Ms. Simpson or Ms. Dinkins-Malone and could only recall a handful of interactions with Ms. Fearbry Jones.  *See* ECF No. 42-1 at 147:3–148:17 (Simpson and Dinkins-Malone), 150:7–13 (Fearbry Jones).

And, even if the unprofessional treatment Ms. Frankovich received from Dr. Crenshaw rose to "materially adverse" levels, Ms. Frankovich cannot point to any evidence causally linking her discrimination complaint to Dr. Crenshaw's conduct.  Indeed, besides not pointing to evidence of when (or even if) Dr. Crenshaw learned of Ms. Frankovich's complaint, Ms. Frankovich conceded that Dr. Crenshaw was generally known for being domineering and rude;  that Dr. Crenshaw's unprofessional treatment of Ms. Frankovich predated Ms. Frankovich filing her First Charge;  and that Mr. Anderson testified to his belief that Dr. Crenshaw's behavior towards Ms. Frankovich stemmed from friction between Dr. Crenshaw and Mr. Anderson.  *See* ECF No. 50 at ¶¶ 200–02, 206, 280.  Thus, even if Dr. Crenshaw's treatment of Ms. Frankovich had satisfied the "materially adverse" standard, the evidence in the record does not permit a reasonable inference that Dr. Crenshaw's actions were causally linked to Ms. Frankovich's complaint.  The same is true for Ms. Frankovich's claim with respect to the conduct of Ms. Jamilla Rice, Ms. Jocelyn Artinger, and Ms. Kymberly Cruz, which consisted of rudeness, informal performance complaints, unresponsiveness, and the like.  *See id* at ¶¶ 281–84.  That is, Ms. Frankovich attributed their actions to Dr. Crenshaw's influence or direction, *see id.* at ¶ 217;  thus, even if their behavior had risen to "materially adverse" levels, because there is no evidence of when (or even if) they or Dr.

Crenshaw learned of Ms. Frankovich's complaint, there is insufficient evidence to infer a causal connection to support Ms. Frankovich's retaliation claim.

Accordingly, judgment will be entered in PPS' favor with respect to Ms. Frankovich's retaliation claim in Count II.

## IV.   Conclusion

For the foregoing reasons, Defendant Pittsburgh Public Schools' Motion for Summary Judgment will be GRANTED.   Accordingly, Ms. Frankovich's claims will be dismissed and judgment will be entered in PPS' favor.

DATED this 23rd day of August, 2021.

BY THE COURT:

/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
United States District Judge

cc (via ECF email notification):

All Counsel of Record